20 F.3d 720
 145 L.R.R.M. (BNA) 2897, 127 Lab.Cas. P 11,066
 Ray STEVENS and Dan Streeter, Plaintiffs-Appellants,
v.
NORTHWEST INDIANA DISTRICT COUNCIL, UNITED BROTHERHOOD OF
CARPENTERS and International Union, United
Brotherhood of Carpenters, Defendants-Appellees.
 No. 92-4092.
 United States Court of Appeals,
Seventh Circuit.
 Argued Nov. 29, 1993.
Decided March 30, 1994.
 
 Thomas H. Geoghegan (argued), Robert C. Drizin, Despres, Schwartz & Geoghegan, Chicago, IL, for plaintiffs-appellants.
 Paul T. Berkowitz (argued), Berkowitz & Associates, Chicago, IL, for Northwest Indiana Dist. Council, United Broth. of Carpenters.
 Frederick G. Cloppert, Jr., Russell E. Carnahan, Cloppert, Portman, Sauter, Latanick & Foley, Columbus, OH, for defendant-appellee.
 Before BAUER and FLAUM, Circuit Judges, and ROSZKOWSKI, District Judge.*
 FLAUM, Circuit Judge.
 
 
 1
 This case arises out of an intra-union dispute within the United Brotherhood of Carpenters (UBC). After the International reorganized and consolidated some of the union's district councils in Indiana and Michigan, in the process effectuating changes in governing bylaws and dues levels, a local within a newly constituted district along with many of its members sued the International and that District Council, alleging various violations of the Labor Management Relations Act (LMRA) and the Labor Management Reporting and Disclosure Act (LMRDA). On successive motions for summary judgment, the district court dismissed all of the plaintiffs' claims, some for untimeliness under applicable statutes of limitations and some for failure to exhaust union remedies. Appellants challenge the district court's selection of limitations periods, its refusal to allow tolling of the limitations clock during the pendency of union consideration of their grievances, and its application of the exhaustion doctrine. We vacate in part, affirm in part and reverse in part.
 
 I.
 
 2
 Like many large labor unions, the United Brotherhood of Carpenters is organized in three levels. Rank and file union members belong to locals; locals within a set geographic region comprise a district; and the highest tier in the union, overseeing all the locals and districts, is the International. Appellants are individual members of Millwrights Local 1043 located in northern Indiana. In late 1986, the International took control of the district council under whose jurisdiction the Local fell and began a process of reorganization and consolidation. The International dismissed the delegates and officers serving on the old district council--the delegates who made up the council were representatives of the respective constituent locals and were directly elected by the members--and constituted a new District Council by appointing temporary delegates selected by the International from the ranks of the locals. Also as part of the reorganization additional business agents were hired, expanding the number of agents from three to fourteen. (Business agents are key figures in the Union. They arrange employment for union members and thus wield considerable control over the livelihood of members. Business agents also receive $70,000 salaries and business automobiles from the district council.) The temporary delegates soon voted an increase--from 2% to 4%--in the working dues deducted from union members' wages. They also adopted new temporary bylaws to govern the District Council. Under the new bylaws union members would no longer directly elect business agents and District Council officers. Instead, these positions would be filled by individuals selected through a vote of the delegates. In the spring of 1987, the locals, including Local 1043, elected new, permanent delegates to the District Council. That fall, these delegates, operating under the temporary bylaws enacted by their predecessors, elected new officers. In December, the delegates voted to make the temporary bylaws, as well as the dues increase, permanent.
 
 
 3
 Plaintiffs[1] have asserted that they complained informally to union officials about these actions from the time they were taken and were reassured that their concerns would be addressed. However, it was not until March, 1989, at the earliest, that an appeal to the International complaining about the state of members' voting rights was made.[2] A second, more extensive protest was filed by appellant Ray Stevens on November 17, 1989, in a letter to the International's General President, Sigurd Lucassen. President Lucassen responded in a letter dated April 10, 1990, that under the grievance provisions of the union constitution the complaint was untimely.[3] Lucassen, however, also addressed the merits of the grievance and rejected Stevens' contentions. Stevens did not appeal the President's decision to the General Executive Board of the union.[4] Instead, on May 25, 1990, plaintiffs filed suit in federal district court in Hammond, Indiana, naming the District Council and the International as defendants.
 
 
 4
 The plaintiffs alleged that the adoption of new bylaws in the District Council without a membership vote, the District Council's continued operations under those bylaws, and the elimination of direct elections of business agents and the secretary-treasurer of the District Council constituted violations of the UBC Constitution and were thus actionable wrongs under LMRA Sec. 301 (29 U.S.C. Sec. 185).[5] They also claimed that the change in members' voting rights violated LMRDA Sec. 101(a)(1) (29 U.S.C. Sec. 411) and that the dues increase violated LMRDA Sec. 101(a)(3).[6] Plaintiffs further charged that the International imposed an illegal trusteeship, under LMRDA Sec. 302 (29 U.S.C. Sec. 462), by taking control of the District Council in a manner not in accordance with the UBC Constitution. The plaintiffs sought restoration of the old bylaws and voting rights, rescission of the dues increase, an accounting of and damages for the increased dues already collected, and legal fees and costs.
 
 
 5
 The district court dismissed all of the plaintiffs' LMRDA claims on statute of limitations grounds. Because the LMRDA, like many federal labor statutes, does not specify a limitations period, the district court engaged in the accepted practice of applying the most closely analogous statute of limitations from the forum state. The court selected, as applicable to all the LMRDA claims, Indiana's two-year limitations period for tort actions and accordingly found plaintiffs actions to be untimely.[7] With respect to Sec. 101(a)(1), the district court noted that it was bound by our decision in Clift v. International Union, UAW, 881 F.2d 408 (7th Cir.1989), where we held that Indiana's tort limitations period applied to a Sec. 101(a)(1) claim. With respect to Sec. 101(a)(3) and Sec. 302, the court was persuaded by our reasoning in Clift and the Supreme Court's approach in Reed v. United Transportation Union, 488 U.S. 319, 109 S.Ct. 621, 102 L.Ed.2d 665 (1989), that the two-year personal injury period should likewise apply.[8]
 
 
 6
 The district court rejected plaintiffs' argument that the limitations clock should be tolled for the periods in which internal union remedies were pursued. Because plaintiffs did not formally seek relief within the union for over a year after the alleged harm, thus failing to comply with the union procedural requirement that grievance appeals be made within thirty days of the underlying incident, the court found the tolling principles articulated in Frandsen v. Brotherhood of Ry., Airline and S.S. Clerks, Freight Handlers, Express and Station Employees, 782 F.2d 674 (7th Cir.1986), inapposite and declined to allow tolling for any period in which the plaintiffs may have been awaiting union response to their complaints. Nor was the district court persuaded to recognize any species of equitable tolling by plaintiffs' claims that the union enticed them to forego the formal appeal process by stringing them along in informal negotiations. The court reasoned that not holding potential plaintiffs to the formal review process would "foster wasteful litigation of fact sensitive estoppel issues when the ultimate issue is a simple matter of procedural law that imposes a minimal burden of vigilance."
 
 
 7
 Finally, the district court dismissed plaintiffs' LMRA claim for failure to exhaust union remedies. The court noted that the plaintiffs neither filed their initial intra-union complaint in a timely fashion (i.e. thirty days from the accrual of their grievance) nor appealed President Lucassen's decision to the General Executive Board (something which they likewise had thirty days to do under union grievance procedure). The court concluded that the latter failure by itself constituted clear neglect of a mandated intra-union remedy even if the former were not under the circumstances of the case. The district court also rejected plaintiffs' assertions that exhaustion would have been futile, citing a lack of evidentiary support for such a conclusion. Further, exhaustion is not excused generally, the district court ruled, merely if any appeal plaintiffs could have made would have been to essentially the same body which allegedly had wronged them. Without evidence of actual futility at "every step of the grievance process," quoting Sosbe v. Delco Elec. Div. of General Motors Corp., 830 F.2d 83, 86 (7th Cir.1987), the court felt that "particularly where an appeal was not attempted, any presumption that it would have been futile because made to the breaching party is overcome by the policy considerations in favor of exhaustion." The court explained that "[t]o hold otherwise would excuse exhaustion in every case where a union is charged with violating its own constitution, depriving unions of the opportunity to clean their own houses and every such case would require judicial intervention." Appellants now challenge the district court's selection of limitations periods, its refusal to permit equitable tolling, and its conclusion that their failure to exhaust union remedies bars relief under Sec. 301.[9]
 
 II.
 
 8
 Before proceeding to examine the hotly contested rulings from below we must first determine whether an Article III case or controversy exists for appellants' claim of illegal trusteeship. Our jurisdictional antennae are raised in this area because any trusteeship[10] which may have been imposed by the International ceased to exist when the locals elected permanent delegates to the District Council in the spring of 1987 and because the temporary by-laws and dues increase born of the trusteeship were replaced in December, 1987 by measures passed by the new District Council.[11]
 
 
 9
 To discern whether the trusteeship claim under LMRDA Secs. 302 and 304 (the latter creates the cause of action for relief from an illegal trusteeship and vests the district courts with subject matter jurisdiction) has enduring legal relevance, we must identify the injury for which relief is sought in the part of the complaint devoted to this particular alleged violation. Count III comprises appellants' claim of illegal trusteeship, and its last paragraph reads: "Accordingly, plaintiffs seek an order from this Court rescinding all changes in the by-laws of the District Council as may have resulted, in whole or in part from the aforesaid violations. This Court should order either the restoration of the former by-laws ..., or in the alternative, restore the right to vote directly for their business agents and secretary-treasurer, and immediately schedule the holding of such elections, for no later than six months from the entry of this order." In paragraph C of the prayer for relief, plaintiffs asked the court to "Order restoration of the bylaws ... or alternative appropriate relief, as requested in Count III."
 
 
 10
 The relief sought for the alleged illegal trusteeship plainly amounts to the annulment of the current bylaws and election procedures contained therein and the reinstatement of the pre-1986 bylaws. Thus, the current bylaws constitute the complained of injury in this illegal trusteeship claim. However, the bylaws and voting protocols fairly attributable to the alleged trusteeship were only those temporary provisions that were in force while the International's suspension of local control over the District Council continued. When the locals elected new delegates who made the temporary bylaws their own, whatever cognizable harm caused by the alleged trusteeship ended. Any continuing harm flows from measures taken by the elected District Council and is properly addressable through a challenge to their, not the trusteeship's actions.[12] Consequently, this claim does not present a case or controversy within the meaning of Article III. See Allen v. Wright, 468 U.S. 737, 750-53, 104 S.Ct. 3315, 3324-25, 82 L.Ed.2d 556 (1984).
 
 
 11
 Of course, if the election of the permanent District Council were tainted by the International's influence over affairs within the interim council, then the extant bylaws and dues enacted by the District Council might be fairly traceable to a trusteeship which may have existed.[13] Here, however, the subsequent elections were not conducted under the auspices of the trusteeship, which existed, if at all, at the district level; delegates were elected by the locals which were never put under International control.[14] There is simply not enough in the record to call into doubt the bona fides of the new District Council or to suggest that the earlier alleged trusteeship had any pernicious influence on its democratic selection by the locals. Furthermore, plaintiffs have not shown that the International intruded upon the District Council's December 1987 approval of the new bylaws. Because there is insufficient support for the existence of any continuing harm resultant from the alleged trusteeship and because any trusteeship that once existed terminated before this suit was filed, the LMRDA Secs. 302/304 claim should have been dismissed for want of standing. We vacate that part of the district court's judgment addressing this claim and remand with instructions to dismiss.
 
 A.
 
 12
 Appellants do not challenge the district court's holding that their LMRDA Sec. 101(a)(1) equal protection claim takes Indiana's two-year personal injury statute of limitations, apparently recognizing that Clift is controlling precedent on the matter. See 881 F.2d at 411. They do, however, continue to maintain that their claim under LMRDA Sec. 101(a)(3) should be governed by a contract limitations period--either the six-year period Indiana provides for unwritten contracts or the twenty year-period applicable to written contracts. They base their argument on the fact that under Sec. 101(a)(3)(B)(iii) the governing body (as opposed to the membership) of a nonlocal labor organization can only approve a dues increase "pursuant to express authority contained in the constitution and bylaws of such labor organization." Because this inquiry requires resort to the terms of the union constitution and bylaws, which are "contracts" according to Wooddell, the appropriate limitations analogue from state law, they argue, is one of contract not tort.
 
 
 13
 We are not persuaded by this blinkered reading of the statute. In Reed v. United Trans. Union, 488 U.S. 319, 109 S.Ct. 621, 102 L.Ed.2d 665 (1989), the Supreme Court held that a Sec. 101(a)(2) free speech claim, like Sec. 1983 claims for civil rights violations, see Wilson v. Garcia, 471 U.S. 261, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985), is most akin to a state personal injury action and thus should be governed by the latter's statute of limitations. See id. 488 U.S. at 326-27, 109 S.Ct. at 626-27. Because the case involved only a Sec. 101(a)(2) claim, the Court declined "to decide what statute of limitations applies to other Title I actions." Id. at 331 n. 6, 109 S.Ct. at 629 n. 6. And while the dominant issue in Reed was not which state statute of limitations best applied to the Title I claim in question but whether a state or federal analogue was most appropriate,[15] considerations similar to those that pointed the Court toward eventually selecting a tort statute of limitations in Reed and pointed this court to a tort statute in Clift lead us to the conclusion that Indiana's two-year personal injury limitations period likewise applies to Sec. 101(a)(3) claims.
 
 
 14
 Because the analogy between the free speech rights embodied in Sec. 101(a)(2) and state personal injury claims was "apparent" and because "state personal injury statutes are of sufficient length ... to accommodate the practical difficulties faced by Sec. 101(a)(2) plaintiffs, which include identifying the injury, deciding in the first place to bring suit against and thereby antagonize union leadership, and finding an attorney," id. at 327, 109 S.Ct. at 627, the Reed Court found state personal injury statutes to be the most appropriate source for a limitations period. In Clift, we observed that an (a)(1) equal protection claim is of the same species as an (a)(2) free speech claim and that the practicalities of litigation which concerned the Court in Reed were substantially the same for an (a)(1) action; thus, we applied the personal injury statute to such a claim. See Clift, 881 F.2d at 411. More generally, the Court in Reed noted that Title I was enacted as the "Bill of Rights of Members of Labor Organizations," creating personal rights for union members, see id., 488 U.S. at 325, 109 S.Ct. at 626, and that "Title I claims all serve the core function of enhancing union democracy through enforcement of the rights of union members...." Reed, 488 U.S. at 331 n. 6, 109 S.Ct. at 629 n. 6. We echoed that view in Clift, observing that "Title I seeks to protect the political or civil rights of union members" and an (a)(1) violation is "analogous to an infringement of one's constitutional rights, ... redressible under Sec. 1983." Clift, 881 F.2d at 412.
 
 
 15
 Section 101(a)(3), although perhaps more procedural in nature than some of its Title I counterparts,[16] also confers personal rights on union members. It recognizes members' interest in fairly levied dues and fees and establishes that increases may only be imposed under particular and narrow circumstances. Significantly, the provision lays out the forms and procedures required rather precisely. Subparagraph (B) applies to "the case of a labor organization, other than a local labor organization ..."[17] and enumerates three exclusive methods by which a dues increase may be effected:
 
 
 16
 (i) by majority vote of the delegates voting at a regular convention, or at a special convention ... held upon not less than thirty days' written notice, or (ii) by majority vote of the members in good standing of such labor organization voting in a membership referendum conducted by secret ballot, or (iii) by majority vote of the members of the executive board or similar governing body of such labor organization, pursuant to express authority contained in the constitution and bylaws of such labor organization of such labor organization: Provided, That such action on the part of the executive board or similar governing body shall be effective only until the next regular convention of such labor organization.
 
 
 17
 Only the third alternative refers to the union constitution and bylaws, and then only in the very limited context of providing that an interim dues increase may be approved by a leadership vote so long as the power to do so is expressly granted in the intra-union agreements. Appellants seize upon this single instance that 101(a)(3) bases its requirements upon what has been privately agreed to within the union to claim that 101(a)(3) is more like contract than tort.[18] Section 101(a)(3)(B)(iii), however, manifestly is not a generic template for breach of intra-union contract claims. Rather, it represents a particular procedure Congress deemed adequate for temporary adjustments in dues and clearly is but one facet of Sec. 101(a)(3)'s overall scheme to protect union members' interest in stable dues levels. That a procedure laid out in a union constitution is in one narrow and limited circumstance adequate to safeguard union members' dues-related rights does not alter Sec. 101(a)(3)'s essential character as a bestower of such rights.[19] Like an action under its Title I brethren, Secs. 101(a)(1) & (2), a Sec. 101(a)(3) claim is in the nature of a civil rights action and thus borrows a limitations period from state tort law. See Wilson v. Garcia, 471 U.S. 261, 276-78, 105 S.Ct. 1938, 1947-48, 85 L.Ed.2d 254 (1985).[20] The district court correctly applied Indiana's two-year statute of limitations for personal injury actions to appellants Sec. 101(a)(3) claim.
 
 B.
 
 18
 The latest alleged violations of Secs. 101(a)(1) & (3) occurred in December, 1987 when the District Council voted to permanently adopt the dues increase and other bylaws changes. Appellants were informed of this action apparently no later than January 7, 1988.[21] This suit was filed on May 25, 1990, and appellants' LMRDA claims are time-barred unless the running of the limitations clock was sufficiently interrupted by applicable tolling principles. Appellants' argue that tolling should apply for the period in which their appeal was pending before President Lucassen,[22] pointing to our decision in Frandsen. While we disagree that this result is compelled by Frandsen, we are persuaded that "the national labor policy of encouraging workers to pursue internal union remedies, while ensuring them a judicial forum in which to resolve disputes," 782 F.2d at 681, does, under the circumstances of this case, call for tolling of the limitations clock for the period in which appellants' appeal was pending before the International.
 
 
 19
 In Frandsen, we set out to resolve a conundrum highlighted by the Supreme Court's decision in Clayton v. UAW, 451 U.S. 679, 101 S.Ct. 2088, 68 L.Ed.2d 538 (1981), that exhaustion of intra-union remedies, normally a prerequisite to a member's suit against his union for a breach of its duty of fair representation, is excused when exhaustion would be futile; namely, what happens when a union member dutifully seeks intra-union relief but the limitations period expires while he awaits a response? Frandsen held that the statute of limitations[23] is tolled in such a situation even where the intra-union remedies are ultimately determined to have been futile. Such a rule encourages pursuit of these favored private processes (and it relieves putative plaintiffs from having to rightly predict how a yet unknown judge will exercise his discretion to excuse exhaustion). See id. at 681-84, 101 S.Ct. at 2091-92.
 
 
 20
 Unlike the plaintiffs in Frandsen, appellants here did not seek intra-union relief in a timely fashion.[24] Under the union constitution they had thirty days from the time their grievance arose to file an appeal but did not do so for over a year. The district court ruled that this initial belatedness doomed their chance for tolling, although it was undisputed that they did file an appeal and waited almost five months for Luccassen to respond. The district court felt that our decision in Sosbe v. Delco Electronics Div. of General Motors Corp., 830 F.2d 83 (7th Cir.1987), precludes tolling whenever an intra-union remedial procedure is not followed according to its timetable.
 
 
 21
 Sosbe, however, does not represent a blanket rule of default. The plaintiff there "did not employ internal union remedies"; rather, she "informally persisted" to contact many different officials. Id. at 87. We concluded that "[p]ermitting [her] to proceed in this case " would be inconsistent with the Frandsen rationale of encouraging union members to pursue internal union remedies. Id. (emphasis added). Here, by contrast, appellants employed the formal intra-union grievance procedure but did so too late. Sosbe does not reach this case nor is a per se rule that a tardy appeal cannot toll the limitations clock consonant with the policy preference expressed in Frandsen. While denying tolling to all but the pristine may promote the rapid resolution of labor disputes by causing deliberate delayers to rethink their dilatory strategies, such a rule will generally prompt those who missed the often short-lived opportunities for union redress to immediately file suit in federal court and seek refuge in the relatively relaxed futility doctrine of Clayton rather than risk having the statute of limitations expire while they wait for union response to their complaint. A union may be willing to address and remedy a violation raised in even an untimely complaint (and, indeed, in this case Lucassen responded to appellant's appeal on the merits) but would seldom have that opportunity if the complaining member has everything to lose and nothing gain by staying within the system. Cf. Robinson v. Central Brass Manufacturing Company, 987 F.2d 1235, 1243-44 (6th Cir.), cert. denied, --- U.S. ----, 114 S.Ct. 92, 126 L.Ed.2d 60 (1993) (reaffirming that pursuit of internal remedies though optional can toll the limitations period because it furthers intra-union resolution of grievances).
 
 
 22
 Of course, if allowed to toll statutes of limitations without exception, late appeals might be sought just to evade looming time bars. Once, however, a union responds to an appeal in a clear manner, continuing requests are not sufficient to toll the statute. See Pantoja v. Holland Motor Express, Inc., 965 F.2d 323, 328-29 (7th Cir.1992); Dozier v. Trans World Airlines, Inc., 760 F.2d 849, 852 (7th Cir.1985) (per curiam).[25] Thus, a plaintiff cannot "indefinitely delay resolution of labor disputes merely by bombarding his union with tiresome requests for needless review." Id.[26] As a result, tolling the limitations clock during the time in which a union considers an initial but untimely appeal imposes a negligible burden on union administration. Once the union responds to a first appeal definitively (even if summarily), tolling ceases and normally cannot resume. This gives the union a strong incentive not to delay addressing complaints, thus in at least one respect furthering the recognized federal labor policy of rapid resolution of such disputes. And because late-complainants will be much less likely to rush directly to federal court pleading futility, allowing tolling in this limited circumstance also strongly promotes the other great pillar of labor policy, intra-union dispute resolution.[27]
 
 
 23
 In this case, appellants waited approximately 144 days (relying upon the dates in the respective letters) for President Lucassen to respond to their November 1989 grievance letter. They filed suit about 138 days late (relying upon January 7, 1990 as the date they learned of the latest possible violation, see Dozier, 760 F.2d at 850 (claim accrues when plaintiff discovered or should have discovered the acts complained of)). Thus, at least some of their claims could be timely if tolling is proper. From the record before us, we do not have a complete indication of how President Lucassen replied to any earlier appeals, including the one from March, nor can we ascertain the precise scope of that appeal and whether it covered the same ground as appellants' present claims under the LMRDA. If he clearly rejected prior appeals on point as untimely or lacking in merit, then the limitations period should not be tolled because appellants' November plea would only amount to a repetitive request for relief already denied. If not, precise findings as to the dates of claim accrual and tolling are required before the timeliness of this action can be ascertained. Therefore, in reversing the district court's judgment dismissing the LMRDA claims, we must remand to the district court for these determinations. (If they are not controlled by genuine issues of material fact, they can, of course, be resolved on summary judgment. This is for the district court to determine.)
 
 C.
 
 24
 The district court dismissed plaintiffs' LMRA claim because intra-union remedies were not properly exhausted. Unlike Title I of the LMRDA, the LMRA contains no explicit exhaustion requirement to accompany Sec. 301.[28] Nevertheless, the Supreme Court has to a degree embraced one for Sec. 301 claims. In Republic Steel Corp. v. Maddox, 379 U.S. 650, 85 S.Ct. 614, 13 L.Ed.2d 580 (1965), the Court "looked to principles of federal common law," Clayton, 451 U.S. at 686, 101 S.Ct. at 2093 (characterizing Republic ), in requiring that an employee alleging a violation of the collective bargaining agreement between his union and employer exhaust exclusive grievance procedures contained in the bargaining agreement before bringing a Sec. 301 suit on the alleged violation (or more accurately the employee "must afford the union the opportunity to act on his behalf," Maddox, 379 U.S. at 653, 85 S.Ct. at 616). In Clayton, the Court was again faced with a Sec. 301 case involving an employee's allegation that his employer violated the collective bargaining agreement. Clayton, however, was a "hybrid" case, consisting of not only a claim against the employer for breach of the bargaining agreement but also a claim against the union for breach of its duty of fair representation in processing the grievance against the employer. The exhaustion requirement which the employee failed to fulfill before filing suit was not imposed by the collective bargaining agreement; rather, it was an internal union appeals procedure "wholly a creation of the UAW Constitution." Clayton, 451 U.S. at 687, 101 S.Ct. at 2094. Because disputes arising over collective bargaining agreements and a union's duty of fair representation raise issues "extending far beyond internal union interests" and internal union procedures are "potentially lengthy" and "may not be adequate to redress [employees'] underlying grievances," the Court made it explicit that a putative plaintiff's duty to exhaust such procedures can be relaxed. Id. at 688-89, 101 S.Ct. at 2095. The Court indicated that, at bottom, the decision to excuse this type of exhaustion is a discretionary determination informed by three factors in particular:
 
 
 25
 [F]irst, whether union officials are so hostile to the employee that he could not hope to obtain a fair hearing on his claim; second, whether the internal union appeals procedures would be inadequate either to reactivate the employees grievance or to award him the full relief he seeks under Sec. 301; and third, whether exhaustion of internal procedures would unreasonably delay the employee's opportunity to obtain a judicial hearing on the merits of his claim. Id. at 689, 101 S.Ct. at 2095.
 
 
 26
 The district court reasoned that Clayton-like exhaustion is an appropriate prerequisite to place on the filing of the wholly intra-union Sec. 301 claims in this case because "[t]he policy reasons in favor of exhaustion--encouraging private resolution of the dispute--are equally applicable, and perhaps even stronger, when the dispute is purely intra-union." We agree that a union member seeking to enforce union contractual promises via Sec. 301 should face an exhaustion requirement with respect to intra-union remedial procedures of at least the stringency envisioned in Clayton. Here, as in Clayton, initial resort to the contractual grievance process would obviate the need for judicial resolution of labor disputes. In addition, the factor that counseled a hesitant approach to exhaustion in Clayton--the presence of issues "in the public domain," like disputes over collective bargaining agreements and a union's duty of fair representation--is not generally implicated in intra-union Sec. 301(a) suits. These disputes "arising over internal union matters such as those involving the interpretation and application of a union constitution," Clayton, 451 U.S. at 688, 101 S.Ct. at 2095, activate "the policy of forestalling judicial interference with internal union affairs," Id. at 687, 101 S.Ct. at 2094, which was found inapplicable in Clayton where the allegations involved statutory policies extending beyond internal union interests. See also Arthur L. Fox II & Robert B. Sonenthal, Section 301 and Exhaustion of Intra-Union Appeals: A Misbegotten Marriage, 128 U.Penn.L.Rev. 989, 1018-24 (1980) (criticizing Sec. 301 exhaustion requirements least in cases involving only the internal affairs of the union). A discretionary exhaustion requirement applies nicely to wholly internal disputes over union constitutions. It fosters all the things thought worthy of fostering in this area--private resolution of disputes, responsible union self-regulation, union assistance in the interpretation of its governing document, robust union processes--but retains the flexibility to forgive a failure to pursue unreasonable or illusory intra-union grievance procedures.
 
 
 27
 The district court found that plaintiffs failed to exhaust their intra-union remedies by being tardy by over a year in initiating their formal protest and, alternatively, by not appealing the President's denial of their grievance to the General Executive Board as the Union Constitution allows. Either of these lapses constitutes a clear failure to exhaust for LMRA purpose, but the district court concentrated on the latter one and found it unjustified. The district court did not deem excusal appropriate after considering a host of arguments offered by the plaintiffs.[29] Appellants now repeat their claims of futility and their alternative argument they did in fact adequately exhaust union grievance procedures. The latter can be disposed of quickly. It consists mainly of their claims that they informally objected to the President of the Local and a business manager unsympathetic to their cause about the goings on at the District Council. Exhaustion doctrine, however, contemplates the utilization of formal remedial procedures. This was hardly done, and we agree with the district court that "there is nothing unclear about the exhaustion procedure found in Sec. 57 [of the union constitution]." The process was spelled out, but as far as we can tell from the record it was ignored for over a year and then, when ultimately invoked, not followed to completion. There was no exhaustion.
 
 
 28
 Appellants argue that compliance with the formal procedure anyway would have been futile. They begin by pointing to dicta in International Union, Allied Industrial Workers v. Local 589, Allied Industrial Workers, 693 F.2d 666, 676 n. 5 (7th Cir.1982), suggesting that exhaustion of intra-union remedies will never be required when members sue for the dissolution of trusteeships because exhaustion efforts will usually be pointless when they are directed to the same bodies that imposed the trusteeship. See also McDonald v. Oliver, 525 F.2d 1217, 1229 (5th Cir.), cert. denied, 429 U.S. 817, 97 S.Ct. 61, 50 L.Ed.2d 77 (1976); Carpenters v. Brown, 343 F.2d 872, 881 (10th Cir.1965). (Note that Title III of the LMRDA, unlike Title I, does not expressly require pre-suit resort to internal union procedures). As discussed above, however, this action is properly not regarded as such a suit under Title III of the LMRDA; LMRA exhaustion principles remain generally applicable here, and Allied is inapposite.
 
 
 29
 Nonetheless, it is true that exhaustion may be futile because union officials hearing the grievance had a strong pre-existing interest opposed to that of the complaining members. However, while peppering their briefs with allegations of the General Executive Board's intransigence with regard to all activities related to the reorganization of the District Council and the subsequent changes in bylaws, appellants, unfortunately, have neglected to provide virtually any citation to the record in support of their sweeping claims.[30] To convince us that the district court exceeded the bounds of its discretion by not forgiving their failure to properly exhaust, appellants must establish that "union officials [were] so hostile to [them] that [they] could not hope to obtain a fair hearing on [their] claim." Clayton, 451 U.S. at 689, 101 S.Ct. at 2095. This they have utterly failed to do at least with respect to the General Executive Board's ability to conduct a fair review of Lucassen's rejection of their complaints. Indeed, the only evidence brought to our attention from the record concerning the General Executive Board's conduct of appeals shows that on one occasion the Board did reverse a decision by the President to reorganize some district councils. In no way has it been established that an appeal to the Board would have been futile.
 
 
 30
 Normally, failure to properly exhaust should lead a federal court to stay its hand until exhaustion can be completed (or the dispute resolved in the process). Here, however, exhaustion can never be completed because of the nature of the default; the thirty-day time for taking an appeal to the Executive Board has passed. As the district court ruled, foreclosure from a judicial remedy is the inevitable consequence of an unexcused and irremediable failure to exhaust. See, e.g., Brazinski v. Amoco Petroleum Additives Co., 6 F.3d 1176, 1179 (7th Cir.1993); cf. Gesink v. Int'l Ass'n of Machinists and Aerospace Workers, 831 F.2d 214, 217 (10th Cir.1987). This result may seem harsh, but to allow union members to circumvent their union's grievance-filing timetable and proceed to court unobstructed by the default would drain the exhaustion requirement of its beneficial effects. So long as the timetable is reasonable, failure to adhere to it will typically be fatal. Now, we do not hold that a thirty-day window is necessarily reasonable in all circumstances. Here, it is, as thirty days is generally sufficient to appeal a discrete, easily pinpointable event like a denial of a protest and, as the district court noted, "Plaintiffs have not claimed that the brevity of the period caused their default." We, therefore, can comfortably conclude that the district court did not err in dismissing appellants' Sec. 301 claim for failure to exhaust union remedies.[31]III.
 
 
 31
 To summarize, no Article III case or controversy exists for appellant's claim of illegal trusteeship, and appellants' failure to properly exhaust the UBC grievance process calls for the dismissal of their LMRA Sec. 301 claim. Because the limitations clock should have been tolled for a period undeterminable from this record, we remand the LMRDA claims for appropriate fact finding. If those claims are ultimately found to be timely, the district court must determine whether exhaustion should be excused for those claims. The judgment of the district court is accordingly vacated in part, affirmed in part and reversed in part.
 
 
 
 *
 The Honorable Stanley J. Roszkowski of the Northern District of Illinois is sitting by designation
 
 
 [1]
 The original named plaintiffs in this case included not only the current appellants but also many other members of Local 1043 as well as the Local itself
 
 
 [2]
 This appeal took the form of a three-sentence letter from the Local to the General President of the International and "request[ed] that the voting rights of the membership be re-instated for the purpose of electing the Business Agent(s), Secretary Treasurer-Business Manager and ratification of the Contract and/or Working Agreement." The only response to this submission found in the record is a letter from the General President to the District Council (with a notation that the Local was sent a copy), indicating that the "subject matter [of the Local's letter] is properly a [sic] jurisdiction of the District Council under their authority to establish bylaws for the District Council."
 
 
 [3]
 Section 57 of the UBC Constitution provides that "[a]ny member, or any Local Union ... having any grievance may appeal to the General President within thirty (30) days from the date the grievance occurred."
 
 
 [4]
 Section 57 of the UBC Constitution also provides that "[d]ecisions of the General President on grievances may be appealed to the General Executive Board, whose decision shall be final" and "[a]ll appeals from decisions of the General President ... to the General Executive Board must be filed with the General Secretary within thirty (30) days from the date of receipt of the General President's decision."
 
 
 [5]
 Section 301 provides for suits for violations of contracts between labor organizations in federal court. In Wooddell v. Int'l Brotherhood of Electrical Workers, --- U.S. ----, ---- - ----, 112 S.Ct. 494, 498-501, 116 L.Ed.2d 419 (1991), the Supreme Court confirmed that union constitutions are contracts between labor organizations and that Sec. 301 extends to suits on union constitutions brought by individual union members against their unions
 
 
 [6]
 Section 101(a)(1) grants union members "equal rights ... to vote in elections or referendums ... and to participate in the deliberations and voting upon the business of [membership] meetings, subject to reasonable rules and regulations in [the] constitution and bylaws."
 Section 101(a)(3) sets out the appropriate procedures by which union dues may be increased.
 
 
 [7]
 The court noted that the LMRDA claims accrued no later than late 1987 when the dues increase and bylaws changes were made permanent by the District Council
 
 
 [8]
 The district court also held that Indiana's twenty-year statute of limitations for suits on written contracts applied to plaintiffs' LMRA claim. That ruling is not before us for review, and we accordingly express no opinion with respect to it
 
 
 [9]
 Appellants also have inexplicably devoted eighteen pages of their briefs to the claimed "substantive violations" of the union constitution and federal law. While plaintiffs below did file a motion for summary judgment, the district court did not rule on the merits of their claims because it granted defendants' summary judgment motions on limitations and exhaustion grounds and dismissed the case in its entirety. Thus the merits of this action are not properly before us and we shall not consider the surplusage that has needlessly thickened appellants' submissions
 
 
 [10]
 Whether the temporary assertion of control by the International over the District Council did in fact constitute the imposition of a trusteeship for LMRDA purposes is an issue that the district court determined to be controlled by a genuine dispute of material facts. The correctness of that ruling is not before us
 
 
 [11]
 Appellee's have labeled this problem as one of mootness. We, however, believe that it fits more snugly in the Supreme Court's current Article III schematic as a question of standing. Mootness doctrine refers to events occurring subsequent to the filing of suit which dissipate the requisite personal interest in the resolution of the claim that presumably existed at the commencement of the litigation. See United States Parole Comm'n v. Geraghty, 445 U.S. 388, 397, 100 S.Ct. 1202, 1209, 63 L.Ed.2d 479 (1980). For example, a request for an injunction to dissolve a trusteeship which has been lifted during the pendency of litigation presents an issue of mootness. See, e.g., Air Line Stewards and Stewardesses Ass'n, Local 550 v. Transport Workers Union of America, 334 F.2d 805, 808 (7th Cir.1964), cert. denied, 379 U.S. 972, 85 S.Ct. 648, 13 L.Ed.2d 563 (1965). Here, by contrast, the alleged wrong--the trusteeship--ended long before this case began. Whether, in such a circumstance, the complained of injury is adequately traceable for Article III purposes to the past allegedly unlawful conduct is a matter of "causation," which is in turn a component of the jurisprudence of standing. See Allen v. Wright, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984)
 
 
 [12]
 If monetary damages were sought as a remedy for a harm caused by the International's control over the Council--e.g. overpayment of dues during that period--, the trusteeship claim would be constitutionally viable. Cf. McDonald v. Oliver, 525 F.2d 1217, 1226 (5th Cir.), cert. denied, 429 U.S. 817, 97 S.Ct. 61, 50 L.Ed.2d 77 (1976) (claim against defunct trusteeship for damages not moot). But that is plainly not the case here. Plaintiffs explicitly sought damages for refund of their increased dues in their Title I LMRDA claims, embodied in Count II. While it is conceivable (but not clear from the record) that increased dues were collected during the lifetime of the trusteeship and under the temporary by-laws then enacted, plaintiffs' request for monetary relief did not differentiate between trusteeship and post-trusteeship overcollections and was wholly made part of their Title I claims. The Title III claim simply did not contain a prayer for money damages. Now, attorneys fees may prevent a claim from being rendered moot, see id., but the Article III problem here inheres in the nature of the claim and is not a result of a lifting of the trusteeship after the initiation of substantial legal proceedings. An appended request for fees and costs cannot revive a stillborn claim
 
 
 [13]
 Cf. Wirtz v. Local 153, Glass Bottle Blowers Ass'n, 389 U.S. 463, 88 S.Ct. 643, 19 L.Ed.2d 705 (1968) (holding that an intervening unsupervised election does not moot the Secretary of Labor's LMRDA Title IV remedy for a previous unlawful election). In Wirtz, the Supreme Court ruled that once the Secretary of Labor proves that a violation of Title IV (prescribing standards and procedures for union elections) occurred in a local's election of officers, "the fact that the union has already conducted another unsupervised election does not deprive the Secretary of his [statutory] right to a court order declaring the challenged election void and directing that a new election be conducted under his supervision." Id. at 475-76, 88 S.Ct. at 650-51. The Court reasoned that Title IV, in its structure and mandatory language, manifests a Congressional conclusion that only a supervised election can assure that the taint of an unlawfully conducted election will not continue in the next round of voting. The present case differs fundamentally from Wirtz. First of all, noticeably absent here is something that figured prominently in Wirtz, namely a "Congress[ional] ... articulat[ion of a] chain[ ] of causation" which would "give rise to a case or controversy." Lujan v. Defenders of Wildlife, --- U.S. ----, ---- - ----, 112 S.Ct. 2130, 2146-47, 119 L.Ed.2d 351 (1992) (Kennedy, J., concurring). Secondly, in Wirtz the starting point was an election irregularity, making any assumption that the second, post-filing, unsupervised election remained uninfluenced too tenuous to make; here, there is no history of nonconforming elections to justify a blanket presumption that the intervening election was suspect. Finally, in Wirtz the initial wrong--the first election--and the putative break in causation--the second election--were both on the local union level; here, the trusteeship was allegedly imposed on the District Council while the subsequent elections were conducted within the always-independent locals. In sum, this case is not characterized by either the statutory or factual considerations that swayed the Court in Wirtz
 
 
 [14]
 In their briefs, appellants have referred to intimidatory measures taken against their local by the International. If these allegations had any basis in the record, perhaps we could consider whether they constitute a sufficient causal link between previous International control over the District Council and the outcome of subsequent local elections. But they do not, so we cannot. What we glean from the record is a "line of causation between the illegal conduct and injury too attenuated [for Article III standing to exist]," Allen, 468 U.S. at 752, 104 S.Ct. at 3325. In one of their submissions below, plaintiffs contended that many members were "disgusted and chose not to vote at all" in the 1987 delegate election because the election did not extend to the business agent or secretary-treasurer positions. Even if there were concrete support in the record for this claim (which, again, we have not found), Article III demands more. There must be a definitive link between the trusteeship and the subsequent elections or permanent by-laws adoption beyond uncoerced voter nonparticipation. The record discloses no such thing (nor did a Labor Department investigation of this affair "reveal any continuation of International control or supervision")
 
 
 [15]
 The Court held that the federal labor policies identified in DelCostello v. Teamsters, 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983) (i.e. promoting a stable collective bargaining process and private settlement of disputes under collective bargaining agreements), which led to the decision in that case to borrow the six month statute of limitations from Sec. 10(b) of the National Labor Relations Act for hybrid Sec. 301/fair representation claims, were too tangentially implicated in Sec. 101(a)(2) litigation to override the usual practice of using an analogous state statute of limitation in federal actions for which none have been explicitly provided by Congress. See id., 488 U.S. at 327-33, 109 S.Ct. at 627-30
 
 
 [16]
 For example, Sec. 101(a)(1) and Sec. 101(a)(2), as mentioned, ensure, respectively, equal treatment and freedom of speech and assembly for union members, Sec. 101(a)(4) protects members' right to sue, Sec. 104 grants members and employees rights to copies of their collective bargaining agreements, and Sec. 105 requires unions to inform their members of the LMRDA's provisions. See generally, Martin H. Malin, Individual Rights Within the Union 49-136 (1988). Section 101(a)(5) does, however, guarantee that members will not be disciplined by their union without certain procedural protections
 
 
 [17]
 By centering their argument around the references to union constitutions and bylaws in subparagraph (B), appellants seem to tacitly concede that this subparagraph, not subparagraph (A) which governs "the case of a local labor organization," applies to the dues increased levied by the District Council on the individual members of the constituent locals. Such a concession would be consistent with "the majority view that a higher body can raise the dues of affiliated locals without holding a membership vote [as would be required by subparagraph (A) ]", Malin, at 85, and circuit law, see Denov v. Chicago Federation of Musicians, Local 10-208, 703 F.2d 1034, 1042 (7th Cir.1983) (per curiam)
 
 
 [18]
 Appellants change their approach in their reply brief where they argue that because the appropriate remedy for a 101(a)(3) violation is often return of illegitimate dues already paid, i.e. the "quasi-contract" right of restitution, a 101(a)(3) claim is contract-like and thus should take a contract statute of limitations of some sort. This argument is waived. See Graff v. City of Chicago, 9 F.3d 1309, 1318 n. 6 (1993) (plurality opinion) (en banc)
 Even so, we pause briefly to comment upon it because it once found acceptance in the fifth circuit. See Dantagnan v. I.L.A. Local 1418, AFL-CIO, 496 F.2d 400 (5th Cir.1974) (per curiam); see also Crowley v. Local No. 82, 521 F.Supp. 614, 631 (D.Mass.1981), aff'd on other grounds, 679 F.2d 978 (1st Cir.1982), rev'd on other grounds, 467 U.S. 526, 104 S.Ct. 2557, 81 L.Ed.2d 457 (1984). Looking at this pre-Reed case, we believe that in relying on "guidelines established by the forum state's own courts for testing the basic nature of a cause of action," id. at 402, (and accordingly concluding that under Louisiana law the Sec. 101(a)(3) claim as pleaded was "ex contractu" and not "ex delicto" ) Dantagnan failed to appreciate that "the characterization of [an] action for the purpose of selecting the appropriate state limitations provision is ultimately a question of federal law." Auto Workers v. Hoosier Cardinal Corp., 383 U.S. 696, 706, 86 S.Ct. 1107, 1113, 16 L.Ed.2d 192 (1966) (emphasis added); see also DelCostello v. International Broth. of Teamsters, 462 U.S. 151, 159 n. 13, 103 S.Ct. 2281, 2288, 76 L.Ed.2d 476 (1983). In our view, the proper approach is the one employed by the Supreme Court in Reed: look at the nature of the Title I claim at issue from a federal perspective, characterize it (e.g. civil rights/tort), then look to state law and select the most analogous statute of limitations. See Reed, 488 U.S. at 326-27, 109 S.Ct. at 626-27. (Note that because of the specificity of the statutory language Sec. 101(a)(3) actions are far less chameleon-like than LMRA Sec. 301 actions and thus can be predicted to draw the same state statute of limitations from case to case. Compare Hoosier, 383 U.S. at 705 n. 7, 86 S.Ct. at 1113 n. 7 (limiting the application of state limitations law to the type of Sec. 301 action before the Court).)
 Before leaving this area, we note our concern with appellants' counsel's conspicuous miscitation of authority. On page 23 of the opening brief counsel wrote: "In choosing the best state-law analogy, for a dispute over dues, which is a contractual financial obligation of membership, the overwhelming majority courts have said 'contract '." Of the five cases cited afterwards, only two clearly support the proposition; two others probably do not. What troubles us here, however, is not mere lawyerly overexuberance, with which (unhappily) we are quite familiar. Rather, we are most distressed by counsel's final citation, to Doty v. Sewall, 784 F.2d 1 (1st Cir.1986). There, the first circuit held that the Title I claims at issue were governed by the state statute of limitations for tort actions, in the process demonstrating no acceptance of any comparison to "contract." See id. at 11. Doty provides no support for the textual claim preceding it; indeed, it largely contradicts the claim. While disappointed, we confine our response on this occasion to an admonishment that counsel exhibit far more discernment in the future when citing case law.
 
 
 [19]
 Also, the "practicalities of litigation," which reassured the Reed court that state tort limitations periods generally are of sufficient length to be appropriate for Sec. 101(a)(2) actions, see supra, are virtually the same in this Sec. 101(a)(3) context now before us. (Note that Indiana's two-year period is within the range that the Supreme Court thought typical of state personal injury statutes, see Owens v. Okure, 488 U.S. 235, 244-247 & nn. 8-10, 109 S.Ct. 573, 578-80, 102 L.Ed.2d 594 & nn. 8-10 (1989) (cited in Reed )). Deciding whether to sue (and risk antagonizing union leadership) and finding an attorney are constants whether one is suing for free speech or dues rights. And identifying improper dues increases--which generally are quite discrete events--is, if anything, easier to do than determining if, when and how a free speech abridgment occurred
 
 
 [20]
 In choosing to borrow a state statute of limitations rather than a federal one, as a consequence of Reed, the second circuit has applied a tort limitations period to a Sec. 101(a)(3) claim, apparently assuming (though not discussing) that tort was the best analogue in state law. See Gvozdenovic v. United Air Lines, Inc., 933 F.2d 1100, 1107 (2d Cir.), cert. denied, --- U.S. ----, 112 S.Ct. 305, 116 L.Ed.2d 248 (1991)
 
 
 [21]
 This is taken from the uncontested sworn statement of Gene Sprinkle, then President of Local 1043, that the District Council's actions were announced at a meeting of the Local on that date. No argument is or has been made that appellants were not in attendance or remained otherwise uninformed about what had transpired at the District Council in December
 
 
 [22]
 Appellants only refer to the November appeal in making this argument
 
 
 [23]
 The applicable period for duty of fair representation claims is six months. See DelCostello v. Teamsters, 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983)
 
 
 [24]
 Frandsen also involved an LMRA Sec. 301 duty of fair representation claim, not Title I LMRDA union rights claims. This difference, however, does not demonstrate to us any need to promulgate separate tolling principles in this area. Indeed we perceive a unified approach to tolling as an affirmative good, in the interest of clarity generally and so that union members will not be faced with sorting out a different set rules every time they have a complaint with their unions
 
 
 [25]
 But properly pursuing the intra-union appellate process should not be held against a plaintiff. "Frandsen revealed a preference for private resolution of labor disputes, but only where there is a definite procedure for doing so...." Pantoja, 965 F.2d at 323
 
 
 [26]
 Nor should a plaintiff be able to extract for himself an extra day or two by filing an appeal to his union, forcing it to prepare and send a denial, when time is running out on his claims
 
 
 [27]
 An uncompromising limitations rule also seems a distinctly inapt response to plaintiffs who, although having submitted an appeal to their union after the union by its own rules is required to respond, in good faith await the union's decision whether to act or address the complaint and so forgive their untimeliness. What the appropriate legal consequence of a late attempt to pursue union remedies is, it seems to us, more properly resolved through the application of exhaustion principles. See infra note 31
 
 
 [28]
 Title I clearly authorizes union to require their members to utilize and exhaust internal remedial procedures (for a limited period) before seeking legal redress for grievances. See LMRDA Sec. 101(a)(4) (labor organizations may require members "to exhaust reasonable hearing procedures (but not to exceed a four-month lapse of time) within such organization, before instituting legal or administrative proceedings against such organizations"). Whether to excuse a failure to exhaust before bringing an LMRDA suit is a matter within the court's discretion. See N.L.R.B. v. Industrial Union of Marine and Shipbuilding Workers, 391 U.S. 418, 426, 88 S.Ct. 1717, 1722, 20 L.Ed.2d 706 (1968)
 
 
 [29]
 The factors enumerated in Clayton are not limitations on a court's discretion to excuse exhaustion. See Clayton, 451 U.S. at 689, 101 S.Ct. at 2095. Rather, they represent what are perhaps the most common bases for forgiving a failure to pursue union remedies. Others certainly exist. Cf., e.g., Chambers v. Local Union No. 629, 578 F.2d 375, 385-86 (D.C.Cir.1978) (listing common considerations influencing decisions whether to require Title I exhaustion); Libutti v. DiBrizzi, 337 F.2d 216, 219 (2d Cir.1964) (LMRDA exhaustion not required where "conceded facts show a serious violation of a fundamental right"); see also Kowaleviocz v. Local 333, 942 F.2d 285, 289 (4th Cir.1991). If the district court had misperceived the scope of its discretion and as a result refused to consider other proffered grounds that could legitimately excuse a failure to exhaust, its decision could not stand. That manifestly did not happen in this case. The district court was acutely aware that "[w]hether to excuse a failure to exhaust contractual remediation measures is a matter within the discretion of the court, based on consideration of any and all relevant circumstances" (citing Frandsen ) and so proceeded to examine thoroughly all of the plaintiffs' arguments for excusing their failure to exhaust
 
 
 [30]
 Mere allegations of union hostility may suffice to forestall dismissal at the pleading stage of a suit when the opportunity for factual development has not yet occurred, see Lewis v. Local Union No. 100 of Laborers' Int'l Union, 750 F.2d 1368, 1381 (7th Cir.1984), but at summary judgment, and especially at an appeal of a grant of summary judgment, parties may not safely rest on unsupported assertions in briefs, no matter how vociferous they may be
 
 
 [31]
 If, on remand, the district court concludes that appellants' LMRDA claims are timely, inevitably soon thereafter the court will be forced to apply exhaustion principles to those claims as well. The analysis while similar, is not identical to LMRA exhaustion. Most notably, the failure to appeal cannot by itself doom the LMRDA claims because appellants' duty to exhaust under Sec. 101(a)(4) could not have lasted more than four months and Lucassen took longer than that to respond to their letter of complaint. Thus, if pursuing their grievance with Lucassen in the first instance was futile or otherwise excusable, appellants will not face an exhaustion barrier. This was not resolved by the district court in its original rulings as it relied on the failure to appeal to dismiss the Sec. 301 claim
 We do believe that generally the Clayton considerations are proper guideposts to aid the exercise of exhaustion-excusal discretion under Title I of the LMRDA. In Clayton itself, the Supreme Court looked toward Marine Workers' endorsement of discretionary deference to intra-union procedures in the Title I context. Also, considerations rooted in the same amalgam of concerns have always guided courts grappling with Sec. 101(a)(4) exhaustion. See Malin, at 115-21. And since Clayton, courts have noticed the applicability of its factors to Title I discretionary exhaustion questions. See, e.g., Guidry v. Int'l Union of Operating Eng., Local 406, 882 F.2d 929, 941 (5th Cir.1989), judgment vacated on other grounds, 494 U.S. 1022, 110 S.Ct. 1465, 108 L.Ed.2d 603 (1990); Hester v. Int'l Union of Operating Eng., 818 F.2d 1537, 1546 n. 24 (11th Cir.1987), judgment vacated on other grounds, 488 U.S. 1025, 109 S.Ct. 831, 102 L.Ed.2d 963 (1989).